Case number 24-1199. Sierra Club and Public Citizens Petitioners v. Federal Energy and Radio Laboratory Commission. Ms. McCrary is the Petitioner, and Judge H is the Respondent. We are now for the Respondent's Introduction. Good morning. Good morning. May it please the Court. Rebecca McCrary on behalf of the Petitioner, Sierra Club, and Public Citizens. This case is a challenge to FERC's approval of the Saguaro Connector Pipeline under Section 3 of the Natural Gas Act. FERC has jurisdiction under Section 3 of the Natural Gas Act for facilities exporting natural gas from the United States to a foreign country, as well as jurisdiction over interstate pipelines under Section 7 of the Natural Gas Act. I'd like to discuss three points today. First, FERC violated Section 3 of the Natural Gas Act because the entirety of the 157-mile pipeline is a facility to be used for export. Second, if these are two distinct facilities, the Commission improperly concluded that the connector pipeline was not a Section 7 pipeline. And third, FERC violated NEPA because it improperly limited its alternatives analysis and its indirect effects analysis. Before I dive in, I'd like to provide a little bit of context. This project is a 157-mile, 48-inch pipeline designed solely for transporting all of the gas that it will carry. It will start at the Oaxaca with no interconnections in Texas before it reaches the international border, where it will connect to a proposed pipeline in Mexico and ultimately transport gas to a proposed liquefied natural gas on the west coast there. This is one single pipeline within the United States. If the Commission is only claiming jurisdiction over the 1,000-seat border, we think this is a legal error. I'd like to first start with FERC's Section 3 jurisdiction. The question here is whether or not the Natural Gas Act prohibits FERC from exercising its jurisdiction beyond roughly that 1,000-seat border. Nothing in the Natural Gas Act, FERC's own implementing regulations of the Natural Gas Act, or the Department of Energy's delegation to FERC authorizes the approach that's taken here. This all stems from the need for a Section 3 license to export. Yes, Your Honor. You don't think export has some connotation of what happens at the border? I believe that... Or FERC couldn't view it that way? I believe that in the language used in the Natural Gas Act and in FERC's regulation and in DOE's delegation, they're dividing the word facility that comes with the term export. So Section 3 of the Natural Gas Act, pretty limited language. It just says no person shall export any natural gas from the U.S. But FERC's regulations require Section 3 authorization for those applying to site, construct, or operate, quote, facilities which are to be used for export. But the delegation order from the Department of Energy gives FERC authority over three different things, the ability to approve or disapprove the construction and operation of particular facilities, the site at which those facilities will be located, and when new facilities for export are to be constructed, the place of exit for export. So those are two specific things, place of exit and... The site and the place of export. To me, that has some connotation of the point at or near the border, and there's obviously gray area about, is it 1,000 feet? Is it, you know, the high water mark of the Rio Grande or the low water mark? We're talking about at or near the border, not what happens 100 miles upstream. They couldn't view it that way? Well, Your Honor, FERC has long interpreted the Department of Energy delegation as giving FERC jurisdiction over the siting and the operation of the facilities necessary to accomplish an export. And just that 1,000 feet is not the only part of the facility that's necessary for export. The gas cannot get from the Oaxaca to the border without the entirety of the pipeline. This pipeline is 157 miles long, but FERC is viewing it just as this 1,000 foot project. There's like nothing in the record showing any rationale for that location aside from we've done it in the past. And this is... I mean, speaking of that, though, I think FERC started doing this in 1989, almost without exception, and we've got this exact case across the Canadian border, but putting that aside. For 30 years until Big Bend comes along, and even in Big Bend it wasn't raised until it was too late, why did it take 30 years to discover this very significant legal error? Your Honor, I believe that the determination here is a fact-specific one. There are certain projects where if you look at, I think, Valley Crossing in South Texas, where there are other uses for the gas that's being transported there. That was another instance where there was a pipeline crossing the international border in South Texas, but it had other uses. It wasn't transporting all of the gas contained for export. There were other interconnects along the way, and that could be the case for other projects that have applied the same standards. Do you agree, I think Intervenor said, your position in this case would upset years of precedent and billions of dollars of investment? Your Honor, I believe that it would give a clear criteria for what counts as the facilities necessary for export. For certain projects, if there's no other use aside from exporting everything within it, I believe that is all an export facility. But for projects where they are branching off an interconnected supply gap to, say, a small West Texas town or other uses for it along the route, that would be another fact-specific decision there. Here, all the gas is for export. And I'm not good at geography, but if you have the same pipeline, but it's double its length or whatever it takes, so it actually starts in Oklahoma, and it goes Oklahoma across the border into Texas, but just directly to this export facility. So all it does is take gas from Oklahoma to this export facility. And I take it your position is the entire pipeline from Oklahoma to this export facility should be treated as the Section 3 facility. Is that correct? Your Honor, yes. In that instance, if there's no other, if they're going to build a pipeline that long for those uses, because Section 3 is for the export of gas, but that's under the assumption that there are no other interconnects or uses along the route. That was my hypothetical. That's all it is. And so your position would be that no matter how long this pipeline is, if it's from Canada and crosses the border there, comes all the way down to the United States to this facility here, you're going to call the, assuming that's not, that's all it's doing is straightening it out, you want that whole thing to be subject to Section 3. Your Honor, I believe that would be Section 3. That's the Section 3 review or jurisdiction by FERC, correct? Your Honor, I believe that that could be a combination of Section 7. No, why? It's an export facility. All it's doing, it's an export facility. I don't understand why it's any different. Take out Canada. So say it starts in Minnesota. I don't know where there's gas. But Minnesota, whatever, comes all the way down. And all it does, one pipeline all the way down to Mexico. You said for Oklahoma across Texas, it's just all export facility. Yes, Your Honor. I'm just making it longer. Does it change at some point? I do not believe so, Your Honor. Okay. So then you can't throw Section 7 in here right now. Yes. That just seems like a really bad idea because you know how Section 3 reviews are. There's a presumption that they get approved. There's an absence showing of adverse public interest. I mean, it is a strong presumption. It is much less, much more pro the pipeline of this export facility, much less demanding scrutiny and paperwork and showings than you have under Section 7. Correct? Correct. My two hypotheticals are definitely interstate. But those things would not be subject to Section 7 regulation at all because they would all, under your theory, they would all be treated as the export facility. That's your position? No. Your Honor, I believe that. You just told me that was your position under my two hypotheticals. I believe I misspoke and got a little turned around. I believe that in a hypothetical like that, at a certain point, a line would be drawn on what is necessary for export. Wait, how would you do it under my hypotheticals? I've got my gas here. I make so much more money if I export it to Mexico. It's all going straight there. I don't understand what your line is. I know your line, you want it to be more than 1,000 or 1,400 feet here. What is your test? What is the test that we, FERC, whoever, are supposed to apply to decide when it stops being the export facility and starts being an interstate pipeline or something else? What is your test? Your Honor, I believe the test would be something similar to what was applied in Alaska Gas Line. I know that was an LNG case, but the term facility there was defined as gas that was transported for export and was not subject to Section 7 jurisdiction. It would be a similar test. Well, then you should have given a different answer to me about Oklahoma and Minnesota. I believe I missed it, Your Honor. I apologize. So now essentially what you want is a rule that says if it's coming from an intrastate pipeline, and we have issues about that, but assume it qualifies as an intrastate pipeline and all they're doing is taking Texas gas from wherever in Texas straight down to the border. Then it's the whole pipeline. Yes, Your Honor. But if it crosses a state line, but it's doing the exact same thing, it's just an inch into Oklahoma, it's no longer an export facility. Yes, Your Honor. And the rationale for that, I mean, I know you say that's what you want, but I'm still understanding what in the statutory text precedent or anything would allow this type, requires FERC to draw the line that you want rather than the one they drew. Your Honor, I believe that would be very similar to the pipelines that attach to, say, liquefied natural gas terminals and supply gas to those as well, where some part of the project is Section 7 and some part is Section 3. But the facilities that are just for the export, so that have no other purposes that are not going, those would be Section 3. But you just said that's not the test you want. I mean, that was your first answer, that if they're just for export. But you're saying if it crosses the state line, but it's still just for export, that's not the test. This is why I'm really confused, because I should think that Sierra Club would, when you speak to your client, would prefer Section 7 regulation to Section 3. Yes, Your Honor. And so how far out do you want to draw the, I mean, we don't just go, well, I like that more than that. I think there needs to be some, for us at least, some sort of legal basis for saying that FERC had to define the export facility longer than it did in this case. And your answer is, well, let's look at LNG, and we say if it's just for export there through the LNG terminal, that's good enough, but then you don't like that answer here. So I still don't know what your test is. Your Honor, I may be talking back to what I previously said. I got a little turned around. But I believe that the test would be the facility is necessary, and then when it crosses state lines, it is interstate. So your test is just interstate things. If it's interstate, the whole darn thing is. And if it's interstate, how much is? Pardon? If it's interstate, how much is the export facility and how much is subject to, is a Section 7 facility? The facilities that are, like the language you used. Section 7, you're going to have to include some of the pipeline in Texas so that you're crossing state lines. Yes. How far is it? What's the test? Usually there's additional infrastructure in those locations where you could draw a line, such as the pressure stations or meter stations or something like that. In this instance, there's... I don't understand. They're all exclusively for export. I don't understand why that makes a difference. Well, if you just want to rule it as if it's just an interstate pipeline, then the whole darn thing has to be part of the export facility. But if it's an interstate one that happens to be... Let's imagine the interstate one here is right... It's in Texas, but it's right at the border. But if you add another foot, so it's in Oklahoma, then we have a whole different test for the export facility. I think that's what you're telling me. Yes, Your Honor. And I don't understand the legal basis for that. Here is the fact that nothing in the Natural Gas Act, nor in FERC's regulations specific to the Natural Gas Act, gives them authority to divide it into two separate projects. We're just talking about the portion at the border. I know that there are instances where they could fully... They could one day want to divide it into Section 7 and Section 3 if it crosses a state line. Yes, Your Honor. Why can't FERC take seriously the third possibility, which is state regulation? This thing won't be unregulated. There's a railroad commission of Texas, which, on FERC's view, will handle this. And the interstate... The Section 7 part of this takes that seriously, and crossing a state line is very significant. And if it crosses a state line, it's interstate and FERC controls it. But if it's just within Texas, the state gets to control it. And that's the scheme. Why can't they just think of it the same way in the export context? What's crossing the border is FERC's business, and what's inside the state of Texas is the railroad commission's business. Your Honor, I believe that it's just a coherent standard of review for a single project. So how FERC looks at the environmental harms of a project, how FERC notifies landowners, how FERC assesses environmental harms is different than what the railroad commission does. So breaking a project into two gives two different forms of environmental review, public notice, and the like. But here, FERC has failed to coherently... I mean, it breaks projects according to borders. And that's maybe not a modern way of thinking about it, but this is a pre-1937 scheme. That's the way things were set up then. Well, one of the issues here, Your Honor, is that FERC has failed to coherently explain the legal framework that it's applying here. It offered one explanation in the authorization order of the Saguaro project, and now offers differing explanations before this court in briefing. And both of which, like we discussed earlier, there's past actions where FERC has extended its Section 3 jurisdiction. So FERC's authorization order originally takes the position that FERC could never assert jurisdiction beyond that 1,000 feet at the border, and now says that this jurisdictional approach is something they're able to do under the terms and conditions that they're able to set. But as we discussed earlier, FERC has extended its jurisdiction for export pipelines, such as in San Diego Gas and Electric, and in those Section 3 LNG cases. And the question is whether or not FERC needs to engage in a fact-specific determination on whether or not an individual border crossing pipeline is more like those LNG cases where it's attached or in San Diego. But nothing in the record provides a coherent standard for FERC's position. And FERC's position here rests on this error. We believe it's appropriate to remand for FERC to decide whether to exercise authority that they denied that they had. You're pretty sharply distinguishing between this threshold question of authority and whether FERC should exercise it or not. I mean, can't we just sort of look at what they've done over 30 years, as Judge Walker says? Could they have a nod to federalism concerns? I mean, it's pretty clear. Whether you call it a lack of authority or a declination, deciding not to exercise authority, that's what they've been doing. That's what they're going to do. Your Honor, we just believe that FERC needs to explain the rationale it's using and why it's deciding to separate this project into different projects. Your position is if this had been from Oklahoma, it would have been perfectly appropriate, maybe even required, for FERC to have severed off the export facility and then treated 155 miles under Section 7. In my hypothetical, it's Interstate. Is that right? That's right. Okay. So you don't have any problem with dividing the thing up? Not whenever the same agency is viewing the project as a whole. It's very, very different regulatory regimes under Section 3 and Section 7. So your whole argument, I think, is just it's perfectly rational to make the division that was made here, as long as we also get Section 7 jurisdiction, but if instead we're left with Interstate Pipeline, Texas jurisdiction, it's no longer rational and they need to have more explanation. Sure. I know I'm over time, but is it all right if I move? Did you have another point you wanted to address? I was going to address Section 7 and NEPA, but you would like me to save my time? Just give me 30 seconds. On Section 7, give me 30 seconds why this is controlled by Big Bend. I mean, you know, Intrastate goes up about 100 miles. The company says the upstream connection will be to an Intrastate Pipeline. They have in-state sources. Maybe there's some question about getting 311 authorizations in the future, and we said that's fine. Intrastate, not Section 7. Yes. Your Honor, in Big Bend, one of the factors was the fact that that Pipeline ended near the WAHA Hub versus at the WAHA Hub, which is a source of interstate gas. They also mentioned the fact that there was abundant gas that they could supply into the Trans-Texas Pipeline, which is a Pipeline in Big Bend. Here they've identified the one Pipeline they're going to connect to for sure is the West Texas Pipeline, which we have identified gets interstate gas. We raised that in our rehearing order and in comments that the West Texas System, which the West Texas Pipeline connects to, gets gas from other states as well. And we believe that the commingling of gas makes this Pipeline interstate. And I will start. Any more questions? Were there any answers you were not able to give to our questions today that you would have been able to give if we were in field session, closed session? No, Your Honor. Okay, thank you. Thank you. Good morning, Your Honors. May it please the Court, Jared Fish for the Federal Energy Regulatory Commission. I'd like to start by making a few points in Section 3, move to Section 7, and answer any other questions about any other topics the panel has. The Commission reasonably found that it has jurisdiction only over the border facility at the United States-Mexico border. That determination is rooted in statutory text. It's rooted in the Commission's regulations, in the Department of Energy's delegation order, and as you noted, Judge Walker, at least 30 years of precedent. First, is that something we would assess for reasonableness post-Loper-Bright? There's a legal question. You either have jurisdiction or you don't. Correct. I think it is a legal question that this Court should decide in the first instance.  De novo, yes. Yes. So, beginning with the statutory text. I actually want to get something more specific, and that is, how did you define how much was the export facility here? It doesn't seem to be a consistent amount. In cases, it seems to vary a fair amount. Sometimes it varies a bit. We're talking about a few dozen feet here or there, 1,047 feet or 1,000 feet or 950 feet, with two exceptions. The intercity case for Minnesota and the San Diego gas case. So, how do you decide how much it is? It looks to me like you just took what Saguaro said. You just took their number. Same thing in Big Bend. We need to draw an administrative line somewhere, Judge Millett. We need to draw a reasoned line as to how much is the export facility. And so, if you can tell me what test it is that FERC uses to define how much of it is export facility. I mean, I get the thing that's connecting to Mexico, but you've got to have some test for that, and I didn't see it in the decision. If I missed it, please tell me. I haven't seen any of the decisions. It seems to me that FERC just takes whatever the applicant is proposing as a definition, but I'm sure that wouldn't be what FERC is doing. I'm sure you've got a better answer than that. Well, I have two responses, Judge Millett. First, as concerns this case, all Sierra Club is arguing. The only issue and dispute is whether we were required to assert jurisdiction over the entire 157-mile pipeline. They don't quibble with how we drew 1,000 feet, whether it should have been 1,500 feet or 950 feet. They want all of it. They'd be a lot happier if it had been 80 miles. Split the difference. Well, that's not what they argue. They argue it has to be the whole thing. I'm just asking you how you all make the decision. Does FERC make an independent reasoned decision? Does it have some test that defines how much is the export facility? The test that we use, and this is not directly responsible, the test that we've used is our precedent going back for 30 years. And I think it's important. And what is that test? Please tell me what that test is. The test is something close to the border. When we're talking about Section 3, it can't be zero because there's some distance that a facility takes up at the border. But the statute, our regulations, the DOA's delegation order doesn't give us any principle basis or criteria to use to determine what that length is. So we've had to draw what is admittedly an administrative line, which generally, when we don't have any criteria to go on from a governing statute or regulation, we get great deference in drawing that administrative line. But you have to make a reasoned decision. And by the way, they did quibble with where the line was drawn. It's in their brief. So tell me, you get discretion and you may have expertise in this area. So what's the test? The test is our precedent. Our precedent is not a test. Precedent may apply a test. And so is it – and maybe there's something structural here. I don't know. Is there a building that's the export facility? Is there a particular change in the piping? Or do you just sort of – does this 1,000 foot just sort of in the middle of a pipe somewhere say, now we're an export facility and the rest of it is interstate? Right. I understand the frustration, Judge Millett. And I did inquire as to whether there is anything in the record that might elucidate whether there is a physical piece of equipment at 1,000 feet that could constitute a marker. Perhaps Counsel for Saguaro, which is building the project, might have a more specific answer. So it's just sort of an undifferentiated pipeline that at some point, presumably right on the border, connects with a Mexican pipeline? Correct. I thought it was like a building.  Not even a building. So you're just randomly dividing up the pipeline. I don't think it's random, Judge Millett. I would say 1,000 feet is about 0.2 miles. And 0.2 miles is a rough approximation of what a facility might occupy at, say, an LNG terminal or a liquefaction facility. Did FERC say that somewhere? No. No, you're saying that. I'm saying that. But I think it's also important to recognize here, our line drawing here hasn't been challenged in 30 years.  It's challenged in this case. Yes. In the LNG context, there's a big whole facility, and you can point to it, and it's near the border. Is there anything here like that? Do you need a meter station, maybe, or anything associated with crossing the border? Or is it, as Judge Millett said, is it just that the pipe just continues from the U.S. under the river over the border, and it's one pipe, and it eventually is in Mexico? Here it's one pipe, and eventually it's in Mexico. But, you know, when we're talking about onshore facilities that actually have to liquefy natural gas to prepare it for send-off and export by vessel, there is a very clearly demarcated physical infrastructure. So the thousandth foot, it's not roughly the edge of the river. It's just a nice round number, nice round and small number? And to that point, Judge Katsas, I think... 1093 wasn't all that round and big bend. I'm curious why that was 93 feet longer. That's true, Your Honor. I think in this case where we are just drawing... What's the longest you've done for one of these instead of the export facility? I think the inner city Minnesota case, but that's really the exception. How long was it there? Remind me how long it was there. It was several miles. By the time you looked at weaving in and out of Minnesota, it was several miles. I think it was 2.1 miles in San Diego. But I think those are the exceptions that really prove the point. I don't understand what point you're proving. So some places, I mean, the in and out one is a little potentially different. But two miles in San Diego, 1093 in the big bend, a thousand here. Is the only difference what the petitioner asked for? I can only say that it's consistent with what the petitioner asked for here. And I think it would be arbitrary for us to choose, say, 1012 feet or 1050 feet in a case where we have to draw an administrative line without criteria governing it. I thought you said a few minutes ago that you draw a line that's close to the border. Now, close is not the most precise test imaginable. But, I mean, close is a standard of sorts. A thousand feet, close. Five hundred miles, not close. Right, Your Honor. And I think when we're looking at it, it's certainly much farther away in San Diego. But, you know, there. Make something different. If you imagine that at a thousand feet, we're doing that because at two thousand feet, there's wetlands or there's homes that are going to have to get bulldozed. There's going to be a lot more consequences to recognizing that as within our jurisdiction. That would be problematic, wouldn't it? Sometimes it's two miles, but if it's going to cause too many regulatory issues, we'll make it a thousand feet. It seems very troubling that FERC doesn't apparently have any tests for how much is the export facility. Well, Your Honor. And that's where all the gravamen of your argument is. Export facility, section three, rest we're going to sever off. But we're supposed to accept that argument without any understanding of how you all define what the export facility is in any reasoned, inconsistent manner. Well, I would push back that we've been inconsistent. I think the fact that there are two exceptions, only two exceptions. You call them exceptions. I don't know. Well, only two instances. Why were they exceptions? Is there a reason that it was two miles? Did they explain why that was longer there? Well, in San Diego, the whole length of that pipeline was two miles. So you can see that FERC might be more willing to extend its jurisdiction over the full two-mile length of that pipeline rather than a 155-mile pipeline. In Minnesota, the concern was that there would be no state jurisdiction. I don't even understand that rationale. If it's short and not going to cause any difficulties, we'll do the whole thing. But if it's going to cause problems, we'll make it so short it doesn't cause problems. Or we're going to act consistent with what we've decided before. I think it's important to remember here, Section 3 doesn't require us to assert jurisdiction over border facilities at all. All Section 3A says is we get to approve, well, DOE now gets to approve exports, and FERC and DOE may apply reasonable terms and conditions. And this court in 1974 in District Act said, and so it's a pretty broad view of what terms and conditions means, and it said, okay, terms and conditions is broad enough to encompass facilities that are used for export. But that case itself involves an onshore LNG terminal, a self-contained facility. Can I ask you about LNG? Do I have it right? In the context of LNG, exporting LNG, would FERC take the position that a 100-mile pipeline wholly within a state leading to an LNG terminal is part of the export facility? Yes, and we have in Alaska Gas Line. Is there a difference in pipelines that lead into an LNG terminal? There's a difference in the statute, and this is the critical point. LNG terminals are governed by Section 3. Right, which says the pipeline is excluded if it's subject to Section 7 jurisdiction. It says that, but it also says that our authority over LNG terminals covers all natural gas facilities located onshore or in state waters that are used to transport natural gas. That's where we get our authority to regulate pipelines that are part of an LNG terminal that could be up to 800 miles long, as in Alaska Gas Line. The point here is... The point here is facilities used for export. I'm sorry, go ahead. Whether through that provision or by negative implication of the pipeline exclusion, at least if the mechanism of export is LNG, it seems like the 100-mile long intrastate pipeline is part of the export facility. Because Congress expressly said so in Section 3E, and the court, of course, presumes that where Congress includes language in one provision but omits it in another, that relevant inclusion... The critical we think language for you is... ...is the fact that Section 3A, which we all agree we're under here, only says that we get to apply terms and conditions to exports, whereas Congress was explicit in Section 3E that we may assert jurisdiction over pipelines that deliver gas to LNG terminals. Terms and conditions? You have... Your position is that a term and condition includes some portion of the pipeline. That's what your position in this case? For 30 years, you have spread that language to say it includes some portion of the pipeline used for transportation of gas for export. Some portion, but... Some portion. Okay, you have the authority to cover some portion. Is there anything in the statutory language that says that has to be a different length of pipeline than we use for LNG? Yes, because in Section 717, which is Section 1 of the Natural Gas Act, Congress spoke specifically to our jurisdiction over pipelines. And Congress said we regulate only interstate pipelines, and we regulate no other pipelines. We don't regulate pipelines located wholly within one state. And so if we were to interpret Section 3... Unless it's transporting LNG. Unless it's transporting LNG, but we're not in that tradition. I understand you're not, but I'm trying to understand how you read the language in 3A to let you regulate up to two miles of pipeline, but no more. You definitely get to regulate the pipeline carrying the gas for export under 3A, correct? For some length. For some length. Okay, okay. Were we making it up, or were we interpreting the statute? You're interpreting the statute. Thank you. All right, so you get to regulate the pipeline delivering gas for export, some length of it. And there's nothing in 3A, comparing the language to 3E, that says it has to be close to the border. Well, I think, Your Honor, the court... Or two miles is okay, but five miles is not. I think... That's why I was asking you what the first test is. Right, I understand. If I could come at this from a different angle. The courts read the statutes as a whole. Congress spoke specifically to our regulation of pipelines in Section 717, and it said we don't get to regulate intrastate pipelines. So if we were to interpret Section 3A, which uses a vague, ambiguous term, like terms and conditions, to completely eviscerate that line in Section 717 that says we don't get to regulate... You wouldn't be completely eviscerating it. You would be applying it to only those pipelines that are used for export within the state. That's not evisceration there any more than it is for LNG pipelines. And it doesn't eviscerate it to do it for two miles. Would it eviscerate it to do it for five miles? Just a moment. What is... Would it eviscerate it to do... Your position is it doesn't eviscerate that protection to regulate it for two miles. That's the Commission's position. Well, it... Yes? That's what we decided in San Diego. I don't... Is that your position? That's not my position in this case. That hasn't been our position in virtually every case. I don't believe that... Are you just allowing... Oh, has the Commission sort of confessed error and said that was wrong to do two miles there? I'm not confessing error. No, so that's still your precedent. And I'm just saying on what basis... You can't say that 3A says we can't regulate pipelines at all. If you had... If FERC had said, read that and said, oh, we can't do anything, maybe the connection pipeline to Mexico or whatever joint or something goes in there to connect the two, maybe that we can regulate because that's the actual export point. But your whole point, you said there's some big textual distinction here, and yet that textual distinction does not exclude regulation of a portion of an intrastate pipeline. That's correct because when it comes to looking at what terms and conditions are tended to exports, the action of allowing exports... But the whole thing is for export. That's why it doesn't make... I wish FERC had a test, and then we could say they have expertise or something. But if the entire thing is one pipeline, and there's no meters, there's no facilities, there's no buildings, all you've got is a connection to Mexico, I guess, at some point, Mexican pipeline at some point, then there seems to be... And I see nothing in the statutory text that is answering this question that says two miles is okay, or even a thousand feet is okay, but three miles isn't, four miles isn't. That would be totally blowing up this intrastate pipeline exception. You're regulating intrastate pipeline in this very case, just not the whole thing. Right, because this court has drawn a balance between our authority over exports under Section 3A and Congress's reservation of authority to states over intrastate pipelines. Where did we say the balance is a thousand feet? The court didn't say the balance is a thousand feet, but the language of the statute confers upon us discretion to draw administrative lines, and a thousand feet is a lot more... I'm asking... Okay, all right. I'm getting a dead horse here. The problem is you don't seem to have any reason, explanation for how you draw the line, how much intrastate pipeline is perfectly fine for us to regulate under 3A. And my best response, Judge Millett, is besides two exceptions, we have consistently drawn... Nice to call them exceptions after the fact. Did you call them exceptions at the time? Did you say there was something exceptional about it? No, I don't believe we... Well, yes, in Intrastate, we did. We did. We said that that was a unique... The Canada one. Yes, unique. I'm putting that aside. That's why I'm talking about the San Diego one. But we also said that there would be no state jurisdiction there. In San Diego, I think that case actually supports our ultimate determination here that we can't regulate... I know this isn't precisely your question, but we can't regulate the entire connector pipeline or even several miles because we disclaimed jurisdiction over the to-be-constructed intrastate pipeline to which that 2.1-mile spur segment interconnected. So I think the fact that we said in one case... Right, there's a connection there. That's a breakpoint. You don't have that here. Well, not that I'm aware of that there's a breakpoint. The breakpoint... How many times have you done it in about 1,000 feet? Many times. Dating back to Michigan consolidated gas in 1989 where we said we only get to regulate facilities that are close to the border, perhaps before then. So the reason given there was... Was it 1,000 feet there? I don't think it... I don't know that we specified... I'm not sure if it was exactly 1,000 feet. This is the weird thing, right? Because it's always a different length. If you were just like either a physical facility, right? If you have a new interconnection or building or a meter or something, and otherwise we'll do 1,000 feet, that would be consistency. I understand. 2,000 here. As I look at it, you have access to a lot more than I do. It wasn't the same number all the time. That's the thing that struck me as quite odd. It wasn't the same number all the time. That's correct. And here we chose the wrong number. I see that I'm out of time. I'm happy to address... On the Section 7 issue... I'm sorry, do you guys have more on this? On the Section 7 issue, it seems to me that there's... It's very unclear that they've got... This is unlike Big Bend because there's no finding that there's sufficient intrastate Texas gas to fill the capacity of this. They talk about here's eight other facilities. They don't say that those have available capacity. Normally what FERC says is there's evidence that those have available capacity. Maybe you've got a contract, but if you don't have that, there's evidence those have available capacity. Was there any evidence that there was available capacity to fill or come close to filling this pipeline? Yes. So our representation that it was proposing to build a header system that would... This is JA398. That would aggregate the gas from those eight upstream sources, and those eight upstream sources could supply 5 billion cubic feet of gas. Those eight may well have the capacity to provide that amount of gas. Is there any evidence to think that gas is not already contracted to other pipelines? That's... Don't they have to show that that's available for us to pick up? Well, what they have to show... If there's gas that's not being shipped that we will pick up? I don't know of any case or FERC present that requires that showing. What is required is a showing... If they have that all eight of them were already contracted to other facilities, would this be a reasoned decision by FERC that there's sufficient capacity available? Well, first of all, the test with respect for Section 7, determining whether the pipeline is Section 7 jurisdiction or not, is whether it's only going to transport non-NGA jurisdictional gas, not how much of that gas it's actually going to transport. And also we're on... Is that how your four-part test reads? Whether there are... What's the third prong of your four-part test? Whether there are ample sources of intrastate gas. Ample sources. Is ample sources more than 27% of a very wide diameter pipeline? Well, I'd say, first of all, there's no minimum volume that needs to be satisfied upon commencing service for an intrastate pipeline. That's never been the inquiry. And second... Wait, you have to show... You've got an incredibly wide diameter pipeline here that says it's going to take only intrastate gas down to the border. That's what it's designed to do. And yet there's no evidence in the record that there's available gas... And this is on a particular route, this pipeline, that there is available Texas gas to fill 50% of this pipeline. 60, 70%. Is that correct? I don't think that's right, Your Honor. First, we're on to... Why is this identifying a source of gas without showing that it's available for them? The shippers there that need this pipeline or need some pipeline to ship with. You said if those eight are fully contracted out already, would that be a recent decision? Would that satisfy the third problem? If there were no capacity or no volume available to serve the pipeline and there was evidence of that, then perhaps. But again, first, we're on a substantial evidence standard. The question is whether there's more... Substantial evidence means that there is some available capacity for this pipeline to use that is intrastate. And 27% is sufficient? That doesn't... How I read the third part of your test, because the third part of your test is let's make sure that this is really going to be transporting intrastate gas, which means you've got to show that more than a quarter of this pipeline is going to be filled with intrastate gas. Well, first of all, Saguaro has made representations that they are going to transport intrastate gas and they can make that representation... They make representations. What's the evidence? A representation is not evidence. We've treated those representations as evidence and they're binding. They're binding on Saguaro. First, Saguaro is an affiliate of Westex. They have the same apparent company. They can determine what... But Westex is a source of the 27%. It's these other eight companies that they're not affiliated with. They apparently haven't... They haven't claimed they have contracts with. Well, there's something I could say in the SEAL portion that would inform that a bit. But if Saguaro were not actually going to transport intrastate gas on commencement of service, we would know that. There are ways for us to enforce that representation. Pipelines that carry Section 311 gas need to file Form 549-D with the Commission. Those forms identify the receipt and delivery points of all gas, including intrastate transported gas, on those Section 311 pipelines. So if Saguaro, upon commencing service, isn't transporting any gas... No, they'll do 27% intrastate and then the rest, full capacity or 80% or 90% capacity, is going to be intrastate. What happens then? Well, no. If it was intrastate, then we would probably bring in enforcement action, because that would be breaking this representation. I bet it's going to happen. Let's assume they got their 27%. Right. And then if you... It's easier for me to say 73%, but if you don't want to say 100% capacity, whatever. Ratchet it down a bit. But if the rest of it turns out to be intrastate, what happens? Well, if it eventually turns out to be intrastate, after Saguaro has already secured Section 311 authorization to carry, and I want to be careful... So you're telling me the form here to get 311 authorization. If it turns out that initially... All right, so for the first day, they trickle out their 27%. The first week, they trickle out their 27% and they go, yeah, we're losing massive amounts of money here. And so from here on out... So initially, they did their 27%. But then they don't have any more intrastate gas, because it turns out that's already obligated somewhere else, shipping somewhere else. So then after that, they do 73% or whatever lower percentage you want. Everything else they do after that is interstate. And that's the record they present you and say, hey, we'd love a little 311 authorization here. What happens? So I have a couple of responses to that. First, as far as the statute is concerned, Judge Millett, that's not a problem. There is no requirement that an intrastate pipeline upon commencing service fill its pipeline or have no intention of transporting NGA jurisdictional gas in the future. That is just fine. The only requirement is that the pipeline establish itself as an intrastate pipeline, i.e., transport only non-jurisdictional gas. It doesn't matter if it's 10% of the capacity, 50% or 100%. The only requirement is that it's not FERC jurisdictional, and to determine that the only question the court has to answer is whether all of that gas is non-NGA jurisdictional itself upon commencing service. But there's nothing in our precedent in the statute or this court's cases that require pipeline. And then you just give a 311 certificate after that. And, you know, I'm not going to presume what the commission would do, but that is consistent. This is a very different argument than we got in Big Bend from FERC, which was that they monitor this. If it turns out to be a ruse, that, in fact, this thing is really an intrastate one, it's just got a little ticker of intrastate, that there can be a show cause order, that they could then regulate it under Section 7. They could impose NEPA requirements. This is a very different argument than we got from FERC in the Big Bend case, which wasn't like, as long as they do it for a week, that's all fine, and they are out of Section 7 altogether, even though after the first week of operation, everything they're doing is interstate gas. Well, Your Honor, that would be something that we would look at upon Saguaro's if they were to application for Section 311. You just said it's fine. The statute says it's fine. There's nothing in the statute that says a pipeline is not an intrastate pipeline. There's no pipeline that avoids our jurisdiction if at some point in the future, a week, a month, whatever, it actually intends to transport intrastate gas. It's a different question on whether we would approve a Section 311 application if it turns out that we discover that Saguaro was just building this pipeline as a ruse to transport intrastate gas. That's a separate inquiry, and that could be debated, and that could be litigated. But I think it's important to zoom out. The court can decide the Section 7 issue on one basis, and it's a basis that Sierra Club doesn't dispute, and that's our interpretation of Section 601 of the Natural Gas Policy Act. And this is why it doesn't matter if any of the gas that is transported on the connector pipeline is interstate or intrastate so long as it's all 311 gas, which we know that it is, because there are no connections to interstate pipelines on the connector pipeline. And that is Section 601a to b, which provides that a pipeline that is otherwise a natural gas pipeline and only natural gas pipelines are subject to Section 7 is not such a pipeline by reason of or with respect to the transportation of Section 311 gas. Could they already be given a 311 certificate? No, Saguaro hasn't, but the only reason why Saguaro could be a natural gas pipeline is by reason of the upstream 311 transportation of interstate gas. That's exactly the concern we just had, because that same thing could be a ruse. It could show that all along this was intended, and I'm not maligning any particular company here, I'm just raising generic hypothetical points here, but the same things we did in the Big Bend argument, and that is that if it turns out they actually don't have enough intrastate gas to justify this pipeline, especially at this diameter, and never had it. They haven't shown you unused capacity that's waiting to be shipped, no showing of that. And a week after, a day after, an hour after, the pipeline opens up initially. They shift to all interstate gas. Your argument that this is all fine right now, that they don't challenge this, that it's non-jurisdictional because of Section 311 is not much comfort. Well, respectfully, Your Honor, I think we're talking past each other, because there are two, not all interstate source gas is Section 7 jurisdictional gas. So the point that I'm making is SOWARO would not even need Section 311 authorization to ship any of the interstate source gas that is upstream from the connector pipeline, because all of that gas is covered by Section 311. And Section 601A2B of the Natural Gas Policy Act says if you're... Have they shown that they have that, there's capacity for them to do for that? That that's what their intent to do is? Well, yeah, that's the only gas available. It's the connections to Westex and the other eight potential sources of gas. I thought the other eight potential sources of gas were Texas gas. You're telling me it's not Texas gas, it's 311 gas? Well, again, I could add a little more information in the SEAL portion to that question. But certainly... So I'm sorry, we don't know on the public record what the source of those eight reference companies' gas is? We know that they provide intrastate transportation. So what percentage of their gas is intrastate? So, okay, so they're intrastate pipelines. I don't know what percentage is intrastate or intrastate. But my bottom line point is it doesn't matter. This would be a very different case, a very different case. If the connector pipeline itself connected to a Section 7 jurisdictional intrastate pipeline, then it would matter for jurisdictional purposes whether the connector pipeline was receiving any of that NGA jurisdictional gas upon commencing service. Because if it was, then no way could it be considered an intrastate pipeline. It would have to be a Section 7 jurisdictional pipeline. And in cases where there are interconnections with Section 7 pipelines, we have found Permian Highway, Valley Crossing, where we have found that is not sufficient to take it out of the zone of intrastate pipelines because there still has to be some showing that the pipeline is going to take gas from those intrastate pipelines. Here we don't even have that. It's undisputed that every interconnection is with an intrastate pipeline. And so because a natural gas... because it was not a natural gas company, because the only reason it would be is by reason of Section 311 transporting gas, then it's necessarily an intrastate pipeline upon commencing service. So you can finish the sentence. Would it be accurate to say in this case, as we said in Big Ben, this is not a case where the only realistic or even primary use of an intrastate pipeline is to provide Section 311 service? Yes. Okay, so what's your best support for saying yes? There's the 777 million cubic feet per day capacity Westex, and there's 5 billion cubic feet per day that's available from the other eight sources. And we know that all of that, if any of that gas... is available to this pipeline, or it just has gas when somebody's shipping? Well, I think, you know, I hate to come back to the substantial evidence here, but I think it is significant... Well, here's substantial evidence that it is available for this pipeline. The fact that Saguaro is preparing to... They said it was. ...building a header system to aggregate that gas, yeah. I think that is evidence that Saguaro is... I mean, if they're misrepresenting that and they actually have no plans to build, then that's certainly something that we would take into consideration if Saguaro ever sought 311 authorization. I mean, or we might bring an enforcement action. But I think, respectfully, what Your Honor are potentially asking for here is more than the evidence that was required in Big Ben, and under the substantial evidence standard, I think we have more than shown that, A, there's substantial evidence... The evidence in Big Ben was that there was sufficient intrastate gas. Close that. And I would say... Not 311, intrastate gas. I don't think there was actually an inquiry there whether any of that intrastate gas was already contracted for or not contracted for. I mean... It was already in operation by the time we had our argument. They gave us the volumes of how much intrastate gas, 70%, 80% they've been transporting. Yeah. So that's a lot more substantial evidence than we have here. It might be more in that sense, but I don't think that's responsible. So this is not the same substantial evidence record as Big Ben. Thank you, Your Honor. Thank you. Can I hear from Seguro? I hope I'm saying it right. Seguro? Seguro? I'm sorry, counsel, did you want to go into closed session or do you feel like you said enough? Do you feel like you need to go into closed session? I think it would be helpful first.  Good morning, Your Honor. Jeremy Marwell. Good afternoon, Your Honor. Jeremy Marwell for intervenors, including Seguro Connector Pipeline.  Seguro, like a W.  I would like to touch on both the Section 7 and Section 3 issues. If it's not too jarring, maybe start with Section 3. Talk about the test, the statute, and some of the practicalities that the Court was asking about. At paragraph 23 of the rehearing order at JA-415, the Commission did say that it has consistently said that when a company constructs a pipeline to import or export volumes of natural gas, quote, only a small segment of the pipeline close to the border is deemed to be the import or export facility for which Section 3 authorization is necessary. So that may not be mathematical, but I think it is a test. The argument that petitioners have advanced in this Court, and I think the thing that you need to address, and perhaps the only thing you need to address, is whether that also extends to 155 miles upstream intrastate. And I think that is clearly wrong as a matter of text, context, structure, and history. I'm happy to talk about the details of the statute, but I think the difference between 3A and 3E, the fact that 3E talks about the words facility and transportation, 3A is only import-export. The whole structure of the Natural Gas Act is predicated on preserving state role over intrastate pipelines. And I would say, Judge Millett, with regard to your question, what if there was something at 1,400 feet or some sensitive resource? And the petitioners did not make that argument in this Court that there was something. I think the Court's interpretation in District Acts, which really inferred from the reference to import and export in 3A, the authority over facilities, and we're taking District Acts as we find it. I think that understands that there has to be some discretion in the Commission to draw these lines with respect to facilities. And, of course, District Acts was an import terminal, so there was a fence line, and that was the site. It was easier then. It was. But, of course, Congress also acted in 2005 to add Section 3E to the Natural Gas Act to clarify the Commission's authority. And I think the key point is just I think it would be inconsistent with the structure of the Gas Act to infer sort of extend District Acts 155 miles upstream. Is it that they lack the power or that the Commission may have the power, under the words of 3A, to decide how far up it should go? And thus far, it has done this kind of hard to get my fingers on, but something under the concept of close enough for government work or something. So I think post-looper, we think the Court should say what the best reading of the statute is, and we think the best reading in the specific context of these border crossing pipelines, putting aside LMG, is that the Commission's authority is limited to a short segment of pipeline at the border, the segment that effectuates the international export. And I think that's consistent. The segment that effectuates. So that's going to be like a foot. Well, maybe I can give some. Isn't that what would effectuate the export? It would be where you connect to Mexico? Until then, it's not effectuated. I guess I would concede that the language in District Acts and in Paragraph 23 of the Procurement Order is not mathematical, you know, 1,000 feet and not 1,001. There are many of these projects, including the one in Big Bend and cited in the Commission's brief. Sometimes there is a meter station close to the border. Sometimes there is some other physical thing. I don't think the record in this case shows that's 1,000 feet. The applicants try to propose something that is consistent with the Commission's precedent in the hope that the Commission will apply this precedent consistently. One other observation. Our upstream pipeline here is regulated by the State of Texas as an intrastate pipeline. It's actually a gas utility, which is the term of art. You can see that in the record. I think it's SJA 180. And that means we have an obligation to serve all comers, right? It's sort of step above common carrier. And so if folks come along the pipeline and ask for service, you know, that may happen. So I think that just underscores Texas's role. Do you have affirmative representation that Texas will regulate this? Because petitioners have said that it won't be regulated because Texas will treat it as an export facility. And so is there something affirmative in the record that says Texas will regulate the 155-mile pipeline? Yes, the permits we have gotten from Texas confirming that this is. So if you look at JA 189 and at JA 190, those permit to operate a pipeline in Texas from the Texas Railroad Commission. If I understood petitioners' arguments, Judge Millett, it was more that they disagreed with the way that Texas regulates the pipeline. Right, that's a totally different question. Yes, which I think is a different question. And, of course, what you say about Section 3 here is going to apply in Texas and everywhere else we have a border, both the Canadian and Mexican borders. So I don't think it should wax or wane with the degree of stringency that a particular state chooses to operate. I mean, that is sort of implicit in Congress having chosen to reserve authority to the states. On San Diego, I don't think there was any evidence in the commission's decision that the 2.1 was litigated. So I take the point that we want consistency, but sort of a drive-by jurisdictional ruling, if you don't mind the mixing of metaphors there. And petitioners did not raise San Diego in their rehearing request at all. So I think if there is a sort of failure of explanation concern, I don't think they preserved that on rehearing. So if there are no other questions... Well, if we have to decide something de novo, just trying to ask if they have an informative argument is not something I think someone else can waive from us. I understand. I think the language that the commission used in the rehearing order that I quoted to you is probably capacious enough to encompass that. And if there are specific cases on specific facts where, you know, somebody comes and says, look, there's a really sensitive resource at 1,500 feet or whatever, I mean, the commission can grapple with that. Before you move on to Section 7, is that where you were going to go? I was, yes. Can you expand on the statement in your brief that the Air Club's position would upset billions of dollars of investment? Yes. So, I mean, if you look at a map of Texas, there were border crossing facilities all along, scattered along the southern border, and all of them are served... We're talking about border crossing pipelines, not LNG terminals. And all of them are served by upstream pipelines. I think what Sierra Club is trying to do here is upset the regulatory status of those upstream pipelines, investment decisions, customers who are being served by those upstream pipelines, the role of the State of Texas in regulating all of those pipelines. And there's a reason this case looks like Big Bend. We can talk about how similar or not. But, you know, investment is made in reliance on the standards and the approach that the commission gives. This is a system that relies on private parties to invest in built pipelines. So the 30-year stability of that regime, I think, is something the court could consider, even post-sloper. I mean, the concept of reliance and consistency in agency position, I think, weighs in its favor, even if you don't think, as we do, that you can do it just based on the text. As to whether the upstream is an interstate pipeline, it won't surprise you. We think this is very similar to Big Bend. Maybe one important distinction to start, Judge Millett, with your question about the 27 percent and is it really a ruse, are we really going to be flowing Section 311 gas? Everything coming onto this pipeline, if we build it the way we told FERC we were going to, which is our intention, all eight of those sources that are in the sealed map at JDA 174 are intrastate pipelines. If we were to, in the future, interconnect directly to an interstate pipeline, which I think is what we had in Big Bend, then we would need Section 311 authority. But even as petitioners concede, we haven't said we're going to do that. What we want to build is the thing we told FERC, the thing that's shown on that map. Anything coming off those intrastate pipelines is not a basis to trigger Section 7. So, in a way, it doesn't matter how much comes off West Texas versus one of the other pipes that sources directly from Texas. But what evidence is there? Because, again, we had the evidence, you know, we had the evidence in Big Bend, very strong evidence that they were doing intrastate gas. And here it's very strange. I haven't seen cases like this where they go, well, here's eight, whether it's company suppliers or other pipelines, we'll just say eight suppliers here that we could hook up with without any evidence that, in fact, they have capacity to offer. Any evidence that they have capacity to offer that would be remotely sufficient given the size of this. I mean, you've got a great big pipeline here. So you must have thought you're going to be doing a large volume of something. So where is there substantial evidence that there's available capacity intrastate to run this pipeline to make it economically viable? I'm sorry. No, no. I get it. So I would tick through the things the court said in Big Bend. First, the entire upstream is going to be physically in Texas. Second, we told the commission we were going to flow molecules produced in Texas. Third, the commission interrogated that and asked us about it. The same evidence, by the way. Can I ask you something? Yes. You used molecules and that gave me flashbacks to chemistry and stuff that I didn't understand. So did you tell them that you will be transporting gas produced in Texas? Yes. Is that what Texas sourced gas means as opposed to intrastate gas that's sitting in an intrastate pipeline in Texas, which is what Kirk was suggesting it might be? Yes. Because you just said molecules in Texas, and I'm like, okay, that sounds like it's coming out of the ground in Texas. It is, and I want to try to be clear about that. We made that representation to the commission. That is our intent. In support of that representation, we gave them the sealed map, which has the names and capacity figures of the eight intrastate facilities. Some of those flow 311 gas, as FERC is well aware, because any pipeline that wants to flow 311 gas has to ask FERC, and they issue an order. So WETSEX. Others of those do not have 311 capacity. We gave an example of that in our brief. It's sealed, but you have it. And that means every molecule is coming from the state of Texas. And so what we told them, number one, this is the first round, everything's coming from Texas. That's, I think, exactly the representation that you had in Big Bend. Is it available to you all? Where's the evidence of that? You could point to it, and it turns out there you have contracts with some of the pipelines. I understand. So remember, we're a pipeline. We provide transportation service, right? It is up to our customer, who is also an intervener here and on the brief, the principal customer, to source the gas, the physical molecules, and to arrange the capacity to get it to our facility, right? We just provide it from the facility that you see on that map down to the border. That's our job. And I guess right up to the border. So what you have in the record is support from our customer, who is intending to take the gas down to Mexico, liquefy it, and send it abroad, that this is the facility they're going to use. And we gave them eight different options. Remember, capacity on pipelines also can come and go. I mean, you might think of it in the context of a pipe going to a local distribution company domestically, where they know they were always going to have, you know, a certain degree of need. But here we are in the same region of Texas that we were in Big Bend near the Oaxaca region, the hub, the pricing hub. It is proximate to one of the most prolific production regions in Texas. The commission knows that. They are the expert pipeline agency. And when we tell them the names of those pipelines and the physical capacity of those pipelines, they understand that it is a way to interrogate our submission to them. Available capacity? Yes. It's just weird that no one ever used that adjective. It's quite striking. I understand. I mean, this may not be comforting to you, but one way to think about it is, I mean, if we can't flow the pipeline at 100 percent, that's a commercial risk the company is willing to take. We're going to invest this because we have a customer who wants to pay us to use it. If it turns out to be a bust, you know, obviously that risk is on us. But the key representation, and I hesitate to draw the analogy, but I think it is important to remember that what FERC does in the Section 7 context, you know, when you're reviewing FERC's action for an interstate pipeline, and I know you've had many of these cases, is looking at, you know, the precedent agreement, and is it 50 percent, is it 75 percent? That is not the regulation that FERC does under Section 3 because Congress, as you said at the beginning of the argument, created a statutory presumption in favor of exports. So it is a lighter-handed regulation. And maybe your instinct is that if this were a Section 7 case, you would demand more proof, you know, of available capacity or whatever. But here we have the information we gave FERC plus the submissions from our customer in the record saying that, yes, this is something we want and we're going to use. And I think under the substantial evidence standard, at least as the Court articulated in Big Bend, that easily reaches the – easily passes the test. Any other questions? You had been ticking through some similarities with Big Bend. Did you end up getting to all those similarities? Sorry, I'm going by molecule. Oh, thank you. So I think I said it, but one similarity is that we submitted information about connections with the intrastate pipeline. Judge Millett, in Big Bend, footnote 25 of FERC's rehearing order, so that was the Trans-Picos rehearing order, talked about information that the applicant had submitted there. It is reproduced at JA 253 to 264 of this Court's joint appendix in Big Bend, which is available to you. And you'll see that it is a list of intrastate pipeline connections and physical information about those connections. That's not something that the Court specifically referenced in its opinion, but I think it is an important similarity. I think that was all. Thank you. Thank you. Sorry. All right, thank you. We're going to give you a rebuttal, but it may make sense. You didn't have anything you wanted to say in closed session, but do you have more or have you said sufficient? Because you pointed us to stuff. We have the materials. I would be happy to, if the Court, certainly if the Court has questions about the fields chart at JA 174, which is the chart I've been referring to repeatedly, including the numbers and the specific details, I'd be happy to talk about them. But I think the key point is it's very similar to what you had in Big Bend. All of them are intrastate, and the fact that some of them are 311 is not legally relevant. It's not a ground to assert Section 7 jurisdiction. That's the Commission's Westar precedent, which I think goes very carefully through the text. The answer is no, you don't need to say any more. I'm sorry. Only if the Court had questions about JA 174. All right, so does the government still wish to go to sealed session? I agree with that. If the Court has questions, but based on Mr. Marwell's presentation, I don't have anything that's... Do you have anything you want to ask in sealed session? Do you have anything you want to ask in sealed session? Cancel that. You may come up and have two minutes to rebuttal. I'd like to start with the Section 3 argument. They admit that they have Section 3A jurisdiction. The only question in this case is how far up the pipeline that jurisdiction goes. This is based on the premise that the connector pipeline is a separate project, but nothing divides the facility. As I mentioned, there are no interconnects. And as FERC and intervenors have said, as FERC identified, the end of that 1,000 feet is just a point along the pipeline. And that's at JA 016. And intervenors state that this limitation is due to the Natural Gas Act and not any, quote, factual or operational distinction. I'd also like to point to 18 CFR 153.5, which is FERC's regulations for the Natural Gas Act, and this should apply for Section 3. Section 3A points to any person proposing to site, construct, or operate facilities which are to be used for export. The word border does not come in until Section B, which is any person applying under Paragraph A of this section to construct facilities at the border. And that's for the presidential authorization, which is a separate and distinct thing that projects built at the border need to do. This drawing of the line at 1,000 feet has no basis. As we pointed out in our rehearing request, why is this 1,000 feet? Why is it not a mile, 10 miles? What is the distinction there? And it's just inconsistent with their own authority extending jurisdiction on the other pipelines, as we discussed. I'd also like to point out that the DOE delegation's border is not limited to the border, as we previously discussed. It's for domestic facilities, construction and operations, siting, and for the border location. And they are just misstating it as if number one and two don't apply to export facilities, and means and, not or. It goes through all of these things. I see that I am running out of time, so for these reasons, we believe that this order should be vacated and as an export. All right, thank you. Thank you to all councils. The case is submitted.
judges: Millett; Katsas; Walker